Betty J. HEADRICK a/k/a Betty J.
Rullo, Plaintiff,

v.

CHRYSLER CORPORATION, Defendant.

Civ. A. No. 77–70614.

United States District Court,
E. D. Michigan,
S. D.

Dec. 12, 1980.

Ronald Reosti, Gary A. Benjamin, Reosti & Papakhian, Detroit, Mich., for plaintiff.

Thomas G. Kienbaum, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for defendant.

## OPINION GRANTING JUDGMENT IN FAVOR OF DEFENDANT CHRYSLER CORPORATION

PATRICIA J. BOYLE, District Judge.

Plaintiff brought the present action under 42 U.S.C. § 2000e, *et seq.*, claiming that Defendant unlawfully discriminated against her because of her sex. Plaintiff alleges that since 1969 Defendant unlawfully refused to promote her on several occasions, harassed her, and retaliated against her for complaining of discrimination. Plaintiff seeks lost back pay and front pay as the result of a disabling psychological condition allegedly resulting from the discrimination.

The first issue presented by this case is whether the Court has proper jurisdiction. Defendant urges that Plaintiff failed to meet the jurisdictional filing requisites of Title VII and therefore cannot pursue her claim in this forum. Specifically, Defendant's contention is that Plaintiff's complaints of sex discrimination and the resultant failure to promote relate to a time period prior to 300 days before any Equal Employment Opportunity Commission (EEOC) complaint was filed. Further, Defendant contends that the failure of the Plaintiff to make a specific filing with the state agency bars consideration of any claims since the Defendant contends that filing with the state agency is a prerequisite to filing with the EEOC.

Plaintiff answers that she has met the jurisdictional standards, contending that the violation alleged is a continuing one and therefore can sustain the charge under consideration in the instant case. With respect to the question of state filing and deferral to the state agency, Plaintiff stresses that a state charge was pending when the EEOC complaint was filed.

As shall be addressed in more detail subsequently, the factual circumstances underlying this case are complicated. For purposes of this initial discussion of jurisdiction, it is sufficient to state the following conclusions of fact which will govern only with respect to the question of jurisdiction. Plaintiff filed a complaint with the state civil rights agency in 1969, and the complaint was pending in 1972 and for several years thereafter. Plaintiff subsequently filed a complaint with the EEOC. Though there is some dispute as to the time at which the complaint was actually filed, the latest date is September 5, 1972, the date a formal charge was received by the EEOC. Plaintiff urges that the date of receipt of her initial letter to the EEOC, August 3, 1972, should be the operative date for purposes of filing. The Court, at an earlier point in this litigation, declined to resolve which date should govern for filing purposes and, in light of the result here reached, it remains unnecessary to enter the thicket of cases which attempt to resolve when an informal letter can be treated as an EEOC "filing" for purposes of Title VII.

Returning, now, to the factual framework within which the jurisdictional issue must be considered, Plaintiff was recommended for a promotion on October 18, 1971. That promotion was not approved, though the recommendation remained in effect. Plaintiff alleges that as late as March of 1972 a male was promoted to a position for which she was qualified (Richard Mara, promoted to Wage Administrator). Plaintiff alleges that several other males were promoted to jobs for which she was qualified during the period between her recommendation for promotion and the promotion of Mara.

Turning to a consideration of the applicable law, the initial inquiry is whether Plaintiff is entitled to pursue claims arising up to 300 days prior to her EEOC filing or if she is limited to claims arising within 180 days of the EEOC filing. *See* 42 U.S.C. § 2000e–5(e). Plaintiff contends that attention to these deadlines is immaterial since she alleges a continuing violation. Again, because characterization of the allegations in

the instant case as a continuing violation is not necessary to exercise of jurisdiction, it is unnecessary to resolve that issue. It is sufficient for present purposes simply to note that a promotion claim appears to be relatively finite in nature. Returning then to the distinction between the 180–and 300– day limitation periods, the statute provides that in deferral states the 300–day period can be invoked. Defendant, however, says that Plaintiff failed to avail herself of review of her claim by the Michigan Civil Rights Commission and thereby precluded herself from utilizing the 300–day period.

In *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), the Supreme Court addressed a situation in which a plaintiff has filed with the EEOC in a deferral state on the 291st day after the complained of event. The conclusion was that since deferral to the state agency for a 60–day period was mandatory, there could be no "filing" in the statutory sense until 60 days after the EEOC filing, or 351 days after the complained of event. Since "filing" is required within 300 days, the Court concluded that the trial court properly ruled it was without jurisdiction. Essentially, the Court said that in a deferral state the complainant must file with the EEOC by the 240th day in order that sufficient deferral to the state agency can be had. Implicit in this analysis is the recognition of the EEOC's policy of routinely referring a claim to the state agency in order that the complainant will be in compliance with the deferral policy. *See* 29 C.F.R. § 1601.13.

In the instant case Plaintiff had a pending state agency claim when she filed the EEOC claim. Although the complex factual allegations make it difficult to detect exactly what extent of overlap exists between the EEOC claim and the state claim as it was updated by the Plaintiff through correspondence with the state agency, it can be said with certainty that the same kinds of complaints underlie both actions with the administrative agencies. There is apparently no record of a deferral by the EEOC to the state agency in connection with Plaintiff's September 5, 1972, (or, recalling the reservation of this issue, August 3, 1972) filing with the EEOC. Given the EEOC policy alluded to above, the absence of a specific deferral suggests that the EEOC understood that the state agency did have the same, or substantially the same, issues before it and that the issues had been pending before the state agency for at least sixty days. Furthermore, even if this assumption cannot be taken from the conduct of the EEOC, the Court cannot conceive that the Defendant in a case like that at bar could prevail on the contention that a previous filing with the state agency, encompassing issues that would envelop the subsequent promotion claims that were the foundation of the EEOC complaint, is insufficient to meet the demands of deferral to the state agency. Every policy underlying that statutory deferral provision is satisfied.

Thus, because the EEOC apparently believed adequate deferral had occurred and because it appears that deferral had in fact occurred by reason of the earlier claim filed and pending with the state agency, which claim reasonably would be read to include the subsequent specific allegations made in the EEOC complaint, it is concluded that the EEOC considered a properly filed complaint of Plaintiff. The remaining issue, then, is whether the claim reflects back 240 or 300 days from the date of filing. If one considers the previous state filing as independently sufficient, then Plaintiff could include acts occurring up to a full 300 days prior to the filing. If one concludes that the EEOC should have deferred and constructively did so, presumably by learning of the state agency filing and deciding that no explicit deferral to the state was required, then, under *Mohasco Corp. v. Silver*, actions up to 240 days before the filing could be considered.

Again, it is not incumbent on this Court to determine this specific question of the number of days over which jurisdiction extends. What is established by the foregoing discussion is that the Court does have jurisdiction to consider events arising at least 240 and perhaps 300 days before the filing of the EEOC complaint naming, gen-

erally, those events. Thus, because there was at least one promotion of a male to a position for which Plaintiff claims she was qualified within that period of time and because the Court finds that a recommendation for a promotion for Plaintiff was still outstanding, there is at least a basis for the exercise of jurisdiction over Plaintiff's Title VII claims accruing in the early part of 1972. *See Ettinger v. Johnson*, 556 F.2d 692, 699 (3d Cir. 1977) (effective date of incident concerning promotion list is date less qualified male is promoted over complaining female).

■ In conclusion the Court has jurisdiction to consider Title VII allegations of the Plaintiff. The exact limits of the period over which jurisdiction extends have not been determined for the reason that definition of these boundaries involves ruling on difficult issues of law that need not be reached in this case given the ultimate ruling on the merits. Essentially, the question of the scope of the jurisdiction--as opposed to the fact of jurisdiction--is an issue that can be left for another day. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558--59, 97 S.Ct. 1885, 1889–90, 52 L.Ed.2d 571 (1977).

■ Turning now to the merits of this action, Plaintiff and Defendant agree that the test to be applied in this case is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), but differ in their interpretation of Defendant's burden of proof once a prima facie case has been made out. This test, as applied to promotion claims, *Blizard v. Fielding*, 572 F.2d 13 (1st Cir. 1978), requires that Plaintiff make out a prima facie case by showing (1) that she was a member of the protected class, (2) that she was qualified for the position sought, (3) that she was rejected, and (4) that following her rejection the position remained open and the employer continued to make promotions of persons of Plaintiff's qualifications.

■ While Plaintiff claims that Defendant has the burden of proving legitimate, non–discriminatory reasons for its decision

once Plaintiff has established a prima facie case, the authority for this proposition is factually distinguishable. The clear trend of authority holds that Defendant's burden in an individual claim of discrimination is merely to produce a valid reason for his action, a reason which Plaintiff may rebut with proof which allows the factfinder to conclude that the stated reason is a mere pretext for what in truth was a discriminatory purpose. *Compare Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 879 (6th Cir. 1973), *with Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *and Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011- 15 (1st Cir. 1979), *and Worthy v. United States Steel Corp.*, 616 F.2d 698 (3d Cir. 1980), *and Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir. 1980). As the Court stated in *Loeb, supra* at 1011:

> We think it now clear that *McDonnell Douglas* leaves the burden of persuasion at all times with the plaintiff, and that the employer's burden to "articulate" a legitimate, nondiscriminatory reason is not a burden to persuade the trier that he was in fact motivated by that reason and not by a discriminatory one.

■ Applying these standards to the case at bar, Plaintiff's proofs, fairly evaluated, fail to establish by a preponderance of the evidence either that Defendant unlawfully failed to promote Plaintiff or retaliated against her for complaining of discrimination.

It is undisputed that Plaintiff was a member of the protected class, that from 1969 to January of 1973 she unsuccessfully sought promotion to a management–level position, and that other persons were promoted to those or higher positions during this period.

As to whether Plaintiff was qualified for the position sought, the record is replete with proof that Plaintiff was, at least through 1972, a highly skilled and technically capable employee, though, as shall be discussed, substantial questions remain as to psychological impairments precluding adequate performance of her work at this time.

Assuming arguendo that Plaintiff did make a prima facie case, *see Potter v. Goodwill Industries*, 518 F.2d 864 (6th Cir. 1975), I find that Defendant's proofs articulated a legitimate, non–discriminatory reason for the complained of conduct and that Plaintiff has failed to establish that these reasons are merely pretextual. However, were the Court to look to the evidence of both parties in determining whether a prima facie case has been made, *Mosby v. Webster College*, 563 F.2d 901, 903–04 (8th Cir. 1977); *Bell v. St. Regis Paper Co., Container Division*, 425 F.Supp. 1126, 1134 (N.D. Ohio 1976), I would have a substantial reservation as to whether Plaintiff has made a prima facie showing of discrimination.

The interrelationship of Plaintiff's emotional problems to her work performance and her claim of persistent sexual discrimination and harassment presents the difficult and sensitive question which is at the heart of the case. There is no disagreement between the parties that as of November, 1974, Plaintiff was totally and permanently emotionally disabled. Plaintiff contends that this disability was caused by Defendant's unlawful conduct while Defendant maintains essentially that Plaintiff's condition caused progressive personality problems from 1969 forward resulting in conflict with her co–workers and supervisors, which Plaintiff then and now has magnified and distorted because of her illness. While it is hypothetically possible that Plaintiff's present condition was caused by Defendant's acts, it is similarly possible that Defendant's failure to promote Plaintiff and her perception of retaliation is attributable to interrelational conflict and misperceptions generated by her emotional condition.

Plaintiff at trial described a series of incidents beginning in the fall of 1969 which she perceives as a denial of promotions, harassment, and mistreatment. In 1966 Plaintiff transferred from Chrysler's Power Train group to the Eldon Avenue Axle Plant. She was promoted to the position of Interviewer-Qualifier in the personnel department, a salaried position. Her immediate supervisor was Herbert Priddy; Mr. Priddy's superior was Joseph Hafner.

Plaintiff testified that during this period she was told by Mr. Priddy that she was performing the functions of a Wage & Salary Administrator (a management position) and that she therefore sought a promotion to that position but was told by Priddy that Hafner did not believe in promoting women to management.

During this period of time, it is clear that there were conflicts between Mr. Hafner, Mr. Priddy, and Plaintiff. As nearly as can be determined, Hafner and Priddy (both management people) appear to have been involved in a power struggle. Plaintiff (a salaried employee) was Priddy's ally and thus an apparent object of Hafner's disfavor. Prior to October, 1969 (see Defendant's Exhibit 130c), Hafner was keeping a log which revealed his dissatisfaction with Ms. Headrick and with Mr. Priddy, who both explicitly and implicitly is criticized for what Hafner perceived as Ms. Headrick's deficiencies.

It is undisputed that during October, 1969, Priddy asked Hafner to give Plaintiff a merit increase and that Hafner refused. Mr. Hafner also denied a merit increase for Priddy during this period. It is further undisputed that Priddy, on or about October 13, 1969, submitted a proposed organizational change which would, in essence, have reclassified Plaintiff's position and created a management position for Plaintiff as Salary and Benefits Administrator. Hafner also rejected this proposal. Mr. Hafner did, however, refer Plaintiff's proposed reclassification to corporate headquarters for an evaluation as to whether the work she was performing was management level work.

The testimony of Al Stuart establishes that no inference of discrimination, *Mosby, supra*, 563 F.2d at 903 n.2, can be drawn from corporate headquarters' denial of reclassification (Exhibit 160). Mr. Stuart, who was unaware of Plaintiff's civil rights case, concluded both that her job was not a management job and that it was over-classified as a salary grade 8. The Court concludes, based on the credited testimony of Mr. Stuart (and Exhibit 160) and of Plain-

tiff's own description of her duties, that Plaintiff had been performing clerical duties during this period of time.

Also, with respect to Hafner, I do not credit the statement that Hafner said he did not believe in promoting women; Plaintiff's testimony and exhibits are in conflict as to whether Hafner told her this himself or whether this statement was reported to her by Civil Rights Commission personnel (Exhibit 14) or by someone else. Nor can I credit Plaintiff's claim that Mr. Hafner's stated reasons for his failure to promote Plaintiff were merely pretextual. Plaintiff at trial was given an opportunity to explain virtually every "error" logged by Mr. Hafner. It is clear from her own testimony that Plaintiff rigidly insisted that policy and authority be adhered to and that this caused conflict with other Chrysler employees. Moreover, the fact that Priddy was denied a merit increase also supports the conclusion that Plaintiff's inability to secure promotion stemmed from causes which were not gender based.

During this period of time and prior to an incident with Mr. Paul Henn (which incident will be identified and discussed shortly), Plaintiff alleges that William Brune, a Chrysler management person, told Plaintiff, in response to her request for information regarding her merit increase, that she would not get a merit increase or a promotion until she dropped her sex discrimination claim.

It is clear from Exhibit 162 that a proposed settlement of the claim had been made by the Civil Rights Commission on or about June 2, 1970; the terms were a merit increase of $8.82 and consideration of Plaintiff for the next promotion. While Brune testified that he did not remember the conversation, I agree with Defendant's suggestion that a more reasonable understanding of what occurred between Brune and Plaintiff is a discussion of settlement of the case which would involve dismissal of the claim on the terms proposed and that Plaintiff mistakenly perceived the statement as a threat. This construction of the event is corroborated by the fact that on August 24,

1970, Plaintiff in fact received a merit increase of $14.73 per week (Exhibits 62, 162).

In March of 1970, Chrysler Corporation experienced severe cutbacks and reorganization. The personnel functions at Eldon Avenue, Huber Foundry, and the Detroit Forge plants were combined into one group called the Basic Manufacturing Division (Exhibit 111a). Virgil Anderson was manager of Labor Relations in the combined personnel division.

Plaintiff was initially located at the Huber Foundry and was then transferred to the Forge plant under the supervision of the resident personnel officer, Paul Henn. There were three persons, including Plaintiff, at the Forge under Mr. Henn's supervision. Plaintiff contends that Mr. Henn also caused her problems and discriminated against her by substantially changing her duties.

Mr. Henn testified that Plaintiff generally had problems dealing with other people. In October of 1970, Mr. Henn prepared a memo outlining the functions of each person under his supervision and explained that he expected each to help out the other and to be flexible (Exhibit 125).

Plaintiff apparently felt that the other individuals were interfering with matters within her area. Mr. Henn testified Plaintiff had difficulty with her co-workers because of her inflexibility and that on occasion her attitude was if they were going to do any part of her work, she was not going to do any of it. Mr. Henn testified that on several occasions he counseled Plaintiff about her conduct.

In December of 1970, a confrontation occurred between Henn and Plaintiff, which is referred to in Plaintiff's Exhibit 80 (by Anderson) and described in Defendant's Exhibit 133, a memo by Henn. Mr. Henn's memo, in part, stated:

In my capacity as supervisor I found Betty's recent reactions to be totally unacceptable, her unpredictable moods were having a disruptive influence on my operating unit not only would she object when someone was doing what she con-

sidered her work, but she then refused to do any portion of the job.

In what Mr. Anderson, who was present, described as an "outrageous confrontation," Plaintiff told Mr. Henn that Mr. Hegarty, the Production Superintendent, was revising the planned layoffs which Plaintiff was responsible for implementing. Mr. Henn advised that this matter was within his (Hegarty's) authority, and Plaintiff demanded that he contact the Plant Manager to straighten the matter out. Henn stated that he tried to calm Plaintiff down and that thereafter Plaintiff brought the entire layoff package into his office, threw it on his desk and stated that if Henn wanted to do it, he could "do it all." It is not disputed that Plaintiff called in sick the following day.

As a result of this and prior incidents, Mr. Henn felt he could no longer work with Plaintiff. Mr. Anderson removed Plaintiff from the Forge plant since, despite his avowed sympathy for Ms. Headrick and his criticism of Henn's intransigence, he had concluded that the Forge department had become "psychologically immobilized" and adjustment was more practical with the removal of Plaintiff. Mr. Anderson stated:

> It is the writer's opinion that the most difficult part for Miss Headrick to understand is the importance of having the ability to compromise one's expression of feelings in various working relations. It is the trait of honesty and forthrightness in a very blunt manner which threatens her relationships and has caused the present misunderstanding and very likely any in the past. She recognizes her inability to curb or control this part of her personality, but finds nothing wrong with it, primarily because of her uncompromising sense of integrity. This limits her ability of projection and results in fellow workers' criticism about her to others. [Exhibit 80]

As a result of this problem, Plaintiff offered to resign. However, Anderson refused to accept the resignation, and Plaintiff was eventually transferred back to Group Staff working for Mr. Anderson. On Au-

gust 24, 1970, Plaintiff received a merit increase.

Plaintiff contends that during this period, roughly 1970, nine promotions or transfers were given to men. A promotion for Plaintiff was submitted by Anderson dated October 18, 1971, but it was not approved. In a letter dated June 11, 1972, Plaintiff alleges that she was performing the duties of a personnel representative but that no promotion had been forthcoming, that union members and management workers were interfering with performance of her duties and that someone was delaying her promotion (Exhibit 114).

On August 3, 1972, Plaintiff filed a letter with the EEOC. Plaintiff enclosed her letter (Exhibit 114) referring to the failure to promote her in October of 1971.

In October of 1972, Plaintiff was transferred to Huber. In January of 1973, Plaintiff received a promotion to the position of Employer Services Administrator. Murray Borthwick was her supervisor initially, and in November, 1973, Dan Holland became her supervisor. Mr. Holland, who was clearly sympathetic to Plaintiff and who is no longer a Chrysler employee, gave highly credible testimony.

Mr. Holland testified that Plaintiff was a different person than the competent employee he had known at Eldon in 1966. He testified Plaintiff was late half the time, was not performing her work, and was involved in loud exchanges with people leading to "dozens and dozens" of complaints about her. Plaintiff testified that she was being undermined by her male co-workers at this time, and Mr. Holland stated that when he discussed Plaintiff's work performance with her in 1973 she at first offered the same explanation but later told him she was having severe emotional problems.

Plaintiff's recitation of her difficulties during this period, as well as Mr. Holland's credited testimony, suggest that Plaintiff may have been psychologically disabled as early as this date. Plaintiff detailed some of the difficulties she experienced, including problems with the parking lot, a bulletin

board, the ordering of a new stove, and a door on her office. The persistent theme of this testimony and the underlying connector of these unrelated incidents is Plaintiff's perception that they were manifestations of discrimination against her because of her sex. Plaintiff also recited a series of incidents in which she was undermined by other individuals who failed to recognize her designated area of responsibility while also complaining of discrimination in the failure to reassign an area of her work (which she felt involved "junk responsibilities") to males.

Illustrative of these complaints and Plaintiff's perceptions of them is that, despite the fact that during this entire period of time Defendant was undergoing severe financial setbacks, Plaintiff felt that the failure to honor an order for a new stove for the cafeteria, a request which had to be approved by corporate headquarters, was part of the overall pattern of discrimination against her. As Plaintiff testified at trial, her perception was confirmed by the observation that in 1974, when her duties had been taken over by a male, the stove request was honored.

Despite Plaintiff's performance and in part because of her problems, Mr. Holland in consultation with Anderson recommended a merit increase for Plaintiff. Holland testified that Plaintiff did not deserve the increase but that he and Anderson felt Plaintiff had to be supported.

It is clear that during this period Plaintiff was having great difficulty with her peers and the overall performance of her job. These problems, as well as Plaintiff's recitation of them at trial, are consistent with Dr. Tanay's assessment of Plaintiff's personality characteristics and defensive reactions.

Plaintiff's evidence regarding her attempts to return to work after September of 1974 need not be recited in detail here. I conclude that, because of severe economic cutbacks and thousands of layoffs, Plaintiff's job functions had been divided and absorbed by others and that her reassignment to the safety area by Mr. Holland and

Mr. Anderson was not retaliatory or discriminatory. Plaintiff testified she could not perform this job and did not want it and went on sick leave after a brief period of time. Likewise, there is no credible evidence, direct or circumstantial, that Plaintiff's layoff in February of 1975 resulted from anything other than the fact that there was no work available.

Finally, it must be noted that Plaintiff's claim that she was totally and permanently disabled as of September, 1974, is not factually consistent with the claim that Defendant's discriminatory conduct on two later occasions resulted in a constructive discharge.

With respect to Plaintiff's submission regarding "comparable" males promoted during the period 1969-70, assuming arguendo that they are comparable, the credited evidence establishes that only Mr. Anderson considered Plaintiff "promotable" during this period of time (Exhibits 57, 58, and 59). Mr. Anderson's testimony establishes, however, that he also was aware of Plaintiff's difficulties in working with people, but he felt that if Plaintiff could be persuaded to focus on the present rather than dealing with past grievances she could work very effectively.

Plaintiff's submission of comparables thus may be sufficient to make a prima facie case of discriminatory treatment, but I cannot conclude that Plaintiff's sex was the determining factor in Defendant's failure to promote Plaintiff. The law precluding discrimination does not require Defendant to employ only the most sensitive and skillful supervisors, such as Mr. Anderson, to promote only on the basis of experience, or to find a placement for Plaintiff which would accommodate both her technical efficiency and her emotional condition. So long as the employer's action and policies are not discriminatory, the employer's judgments are not subject to judicial reexamination in a Title VII action. See *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576 77, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978).

Thus, assuming that among the many "comparables" submitted one or some might serve to establish Plaintiff's *McDonnell Douglas* prima facie case, the record does not support a conclusion that Plaintiff's conflicts with Mr. Hafner or anyone else were a subterfuge for discrimination against Plaintiff on the basis of sex. *Cf. Lindsey v. Southwestern Bell Telephone Co.*, 546 F.2d 1123 (5th Cir. 1977) (promotion denied due to attitude problems, not age discrimination). While better or fairer judgments might be seen in retrospect, the relevant question for this Court is whether the given reason is a pretext for illegal discrimination. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979).

Having detailed the history of Plaintiff's claim and with full awareness of the fact that when one claims emotional illness as a result of unlawful conduct, discerning cause and effect is a harrowing task, I conclude that Plaintiff has failed to establish that this history is attributable to Plaintiff's gender.

The medical evidence presented also corroborates the conclusion that Plaintiff's failure to be promoted was not gender based.* Plaintiff's psychiatrist, Dr. Emanuel Tanay, testified that Plaintiff's personality predisposes her to emotional difficulties (Tanay Dep. 16). Dr. Tanay also testified that Plaintiff has had "all kinds of family conflicts," an observation confirmed by the treating physician's records. Dr. Tanay testified that he repeatedly referred Plaintiff to other doctors, but there were difficulties since Plaintiff felt these doctors were not satisfactory. The records of Plaintiff's treating physician (Dr. Strickroot) state "that Patient's troubles really began with a hysterectomy in January of 1964." This history (presumably communicated to the doctor by Plaintiff on April 15, 1968) continues: "After surgery her husband showed extreme antagonism and there was constant turmoil which culminated in divorce in January, 1967. During this time she became extremely nervous, tired, lost weight and had nausea after eating."

While the history also makes reference to Plaintiff's nerve-wracking job, it is clear that in 1968 Dr. Strickroot diagnosed Plaintiff's symptoms of "Fatigue and Drowsiness, Diarrhea and Nausea after meals" as "Psychophysiologic reactions." Plaintiff visited Dr. Strickroot six more times in 1968 describing similar symptoms for which librium, among other medications, was prescribed. Nine contacts with Dr. Strickroot are recorded in 1969, with essentially similar symptoms noted. Sixteen contacts are recorded in 1970. On August 17, 1970, the entry notes: "Much upset over work and recent interview re: civil rights claim." On September 21, 1970, Dr. Strickroot notes: "work situation much improved. Now main source of trouble is her mother-in-law." On November 2, 1970, Strickroot notes: "Taking six librium daily, but often eight and occasionally ten." Twenty contacts are noted in 1971; on February 24, 1971, Strickroot reported: "New blemishes on face similar to June 15, 1970. Believes lesions began when her phone was being used by people from the plant .... Very upset over job problems." There were fourteen contacts in 1972, nine in 1973, and seven in 1974. From October 21, 1974, to April 14, 1975, Plaintiff's condition seemed to improve; on April 14, 1975, she advised the doctor she had stopped using librium. However, her symptoms reappeared; librium was again prescribed, and on October 11, 1976, Strickroot noted: "Nerves bad. Taking too much Librium. Emotionally unstable." He prescribed "Librium, limit six daily." Thus, while Plaintiff's testimony traced all her difficulties to the 1969 conflict with her supervisor Joseph Hafner, this perception is belied both by Plaintiff's own statement in her application for disability that "from 1968 on I was getting progressively worse and could not function

---

* I approach the necessarily detailed evaluation of the Plaintiff's medical records with reluctance for neither the public nor the Plaintiff will be benefited by the exposure of Plaintiff's medical history, including some intimate details thereof. The law requires however that the Court as finder of fact set forth the factual basis for its legal conclusion. Fed.R.Civ.P. 52(a). Thus reservation must give way to obligation.

mentally" and by Dr. Strickroot's records, which identify the onset date as 1964 and which indicate ongoing emotional problems attributed to her work load, other employees, her mother–in–law, her husband, and the civil rights claim.

While Plaintiff's trial proofs centered principally around Mr. Hafner and later difficulties with Mr. Paul Henn, Plaintiff's testimony and exhibits reveal that at one time or another virtually everyone in the work place has been thought by Plaintiff to have been part of a pattern of discrimination. Indeed, Defendant's Exhibit 145, a letter to the MOCR, shows that in November of 1971 even Mr. Virgil Anderson was an object of suspicion. Plaintiff indicated that she found things just the opposite of what she had been told by Mr. Anderson (about the reorganization) and that a woman who had been Hafner's secretary, with whom she did not have a good working relationship, was "constantly into my area." Plaintiff also stated with regard to Mr. Anderson, "I feel him directly responsible for putting me in the position I'm in back at this Plant . . . ."

Further, while Plaintiff contends that Mr. Hafner refused to reclassify her in 1969 because she was a woman, the credited testimony of Henn, Holland, Hafner, and Anderson corroborate Dr. Tanay's opinion and support the conclusion that Plaintiff's rigidity and lack of flexibility caused her difficulty with co–workers and with her supervisors, and resulted in legitimate decisions against her promotion.

By the time of Defendant's Exhibit 146, the fall of 1976, it is clear both that Plaintiff felt enormous pressures in the performance of her work from fellow employees and lack of support from supervisors and that she believed that the plant doctors, who were to examine her for disability retirement, were being untruthful with her. These statements are, of course, consistent with Plaintiff's claim of total disability because of her mental condition, but they are also corroborative of Defendant's contention that Plaintiff's condition is attributable not to acts of discrimination but to a sincere but mistaken fixation diagnosed by Plaintiff's own psychiatrist (Tanay Dep. 19), as "a paranoid attitude" and a "predisposition to emotional difficulties" (Tanay Dep. 16–17).

While Dr. Tanay stated that Plaintiff was not delusional and that he doubted very much that she ever would be, he stated that Plaintiff's disability was a neurosis caused by, among other factors, Plaintiff's emotional predisposition, family conflicts and history, stressful condition at work, and Plaintiff's compulsive and rigid personality characteristic (Tanay Dep. 36–38).

It is significant, I believe, that the two persons most supportive of Plaintiff, Mr. Anderson and Dr. Tanay, suggest the same approach to Plaintiff's problems—one in a treatment mode, the other in a work setting. Both agree that the best approach is to focus Plaintiff on the present and to avoid dwelling on past grievances. Although tangential to the Court's conclusion, these observations tend to support the finding that Plaintiff's complaints stem from a tenaciously held and longstanding sense of victimization, which caused Plaintiff to misperceive and magnify incidents occurring in the work place and to come into conflict with co–workers to the extent that she was considered non–promotable.

Accordingly, for the reasons stated, I conclude that Plaintiff has failed to prove by a preponderance of the evidence that she was discriminated against in terms either of promotion or of retaliation.

The foregoing will constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), and the Clerk is hereby directed to enter an order reflecting the judgment of the Court.